[Civ. No. 22259.   First Dist., Div. One.   July 30, 1965.]

COLONIAL SAVINGS AND LOAN ASSOCIATION, Plaintiff and Appellant, v. REDWOOD EMPIRE TITLE COMPANY et al., Defendants and Respondents.

188

E. C. Mahoney and C. Richard Lange for Plaintiff and Appellant.

Anderson, McDonald & Beldon and John E. McDonald for Defendants and Respondents.

SIMS, J.—Appellant savings and loan association has appealed from that portion of a judgment against respondent title insurance companies which denied it recovery for sums representing the amounts of certain street improvement liens against properties on which appellant granted loans through escrows for which respondents were concededly responsible.[1]

On October 24, 1960, under its application number 15824 respondent Redwood Empire Title Company, as an affiliate of respondent City Title Insurance Company[2] issued its preliminary report covering nine lots in the Rohnert Park Subdivision to Edmor Construction Company. This report reflects that the title to the lots as then vested was "Subject to: 1st: 1960-61 Sonoma County Taxes [the amounts of the first and second installment of taxes and the assessment number is set forth for each of the nine lots]. 2nd: The herein described property lies within the boundaries of Rohnert Park Special Assessment District and is subject to all assessments and obligations thereof." There follows "3rd" which covers setbacks and easements, "4th" which covers a declaration of restrictions, and "5th" which refers to an existing encumbrance.

On the same date the title company issued to the same addressee a similar preliminary report under number 15825 which covered two other lots. It reflected not only current

---

[1] So much of the judgment as awarded appellant recovery for the amount of seven other liens against one of the parcels involved is concededly correct and is not at issue on this appeal.

[2] This relationship is alleged in the first amended complaint, and although denied by respondents in their answers, it was apparently conceded at the trial. The judgment for the amount of the admitted liens runs against both respondents, and no appeal has been taken therefrom by either respondent. They will hereinafter be referred to as "respondents" or collectively as "the title company."

taxes, but also that 1959-1960 Sonoma County taxes were delinquent and the total amount necessary to redeem for each of the lots. The language in regard to the assessment district omitted the words ''and obligations'' and added ''(These assessments are collected with the County Taxes).'' Each of Items 3rd, 4th and 5th, although different in its express terms, referred to a matter similar to that in the respective number of the other report.

On November 17, 1960, under number P-20007, the title company issued a preliminary report to appellant covering another lot in the same general subdivision. This report is similar in tenor with the foregoing and contains language which is identical with that in number 15825 in regard to the assessment district.

The final report involved was issued May 31, 1961, to Empire Mortgage under number P-20458 and covers one lot ''Subject To: 1st:'' 1959-1960 and 1960-1961 Sonoma County Taxes setting forth the amounts thereof; ''2nd:'' reference to the assessment district in the same language as in numbers 15825 and P-20007, with the addition in the parenthetical clause of the words ''and are not yet payable.''

On November 23, 1960, appellant gave the title company a letter of instructions concerning the 11 lots referred to in reports 15824 and 15825. Insofar as is material here this letter recites as follows: ''Please have the loan documents properly signed, dated, acknowledged and recorded, upon issuance of your final A.T.A. title policies showing record title of real properties described in the preliminary reports under the above numbered escrows vested in Edmor Construction Co., Inc., a California corporation, and insuring the deeds of trust as a first lien on the properties described therein, subject only to exceptions No. 2, 3 and 4 of above numbered escrows. First installment of taxes for 1960-61 must be paid. . . .

''Recordation is to be delayed until you have received evidence than an approved bond has been issued guaranteeing the performance and payment for paving, sewers and installations as are required and necessary for the development of the tract.''

At the time of this transaction there were liens for improvement bonds against the first nine lots of $2,012.04 each, and against the last two lots of $391.31 each.

On December 9, 1960, appellant gave the title company

instructions covering the lot which was the subject of report P-20007. This letter requested issuance of a title policy in substantially the same words as set forth above in the letter of November 23rd. There was no reference, however, to the guarantee bond. At the time of this transaction there was a lien on this lot for improvement bonds of $391.31.

On June 16, 1961, similar instructions were given in respect of the property which was the subject of report P-20458. This property was likewise subject to a $391.31 lien for improvement bonds.

In each case the transaction was closed after receipt of the instructions and title insurance was issued by respondents which insured appellant "against loss or damage . . . by reason of . . . assessments for street improvements under construction or completed at the date hereof which now have gained or hereafter may gain priority over the lien upon said land of said mortgage or Deed of Trust, other than defects, liens, encumbrances and any other matters set forth as Exceptions 2, 3, and 4 in the aforementioned title insurance policies."

Upon discovery of the existence of the liens for the improvement bonds appellant made demand on the title company for their payment, and commenced the instant suit when its demand met with refusal. The action is not upon the title insurance policies but to recover damages for an alleged failure of respondents to carry out the escrow instructions.

■ Appellant relies on the principles recently set forth in *Spaziani* v. *Millar* (1963) 215 Cal.App.2d 667 [30 Cal. Rptr. 658], as follows: "An escrow holder is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow (*Shreeves* v. *Pearson,* 194 Cal. 699, 707 [230 P. 448]; *Todd* v. *Vestermark,* 145 Cal.App.2d 374, 377 [302 P.2d 347]); bears a fiduciary relationship to each of them (*Amen* v. *Merced County Title Co.,* 58 Cal.2d 528, 534 [25 Cal.Rptr. 65, 375 P.2d 33]); and owes an obligation to each measured by an application of the ordinary principles of agency. (*Rianda* v. *San Benito Title Guar. Co.,* 35 Cal.2d 170, 173 [217 P.2d 25].)

■ "It is the duty of an escrow holder to comply strictly with the instructions of his principal (*Amen* v. *Merced County Title Co., supra,* 58 Cal.2d 528, 531; *Rianda* v. *San Benito Title Guar. Co., supra,* 35 Cal.2d 170, 173; *Karras* v. *Title Ins. & Guar. Co.,* 118 Cal.App.2d 659, 665 [258 P.2d 866]), and if he disposes of the property of his principal in

violation of these instructions, or otherwise breaches that duty, he will be responsible for any loss occasioned thereby. (*Amen* v. *Merced County Title Co.*, *supra*, 58 Cal.2d 528, 532; *Rianda* v. *San Benito Title Guar. Co.*, *supra*, 35 Cal.2d 170, 173; *Jones* v. *Title Guaranty etc. Co.*, 178 Cal. 375, 380 [173 P. 586].)    Likewise, it is the duty of an escrow holder to exercise ordinary skill and diligence in his employment (*Amen* v. *Merced County Title Co.*, *supra*, 58 Cal.2d 528, 532; *Rianda* v. *San Benito Title Guar. Co.*, *supra*, 35 Cal.2d 170, 173), and if he acts negligently he is responsible for any loss occasioned thereby, subject to the rules ordinarily applicable in the premises. (*Amen* v. *Merced County Title Co.*, *supra*, 58 Cal.2d 528, 532; *Rianda* v. *San Benito Title Guar. Co.*, *supra*, 35 Cal.2d 170, 173; *Karras* v. *Title Ins. & Guar. Co.*, *supra*, 118 Cal.App.2d 659, 665.)'' (215 Cal.App.2d at pp. 682-683.)

An examination of the cases referred to above, and others[3] applying the same principles, fails to produce a factual situation similar to that involved in this case. Appellant relies on the language in each of the instructions which request insurance ''insuring the deed[s] of trust as a first lien on the properties described therein.'' In each of the instruments, however, the foregoing language is followed by and qualified by phrases reading, ''subject [only] to exceptions No. 2, 3 and 4 of above numbered escrow[s].'' In each case exception ''2'' refers back to the language subjecting the property to all assessments of the Rohnert Park Special Assessment District.    There can be no question that in connection with interests in real estate the words ''subject to'' denote an exception to whatever interest is described by the language preceding that phrase. (See *Smith* v. *Star Petroleum Co.* (1930) 103 Cal.App. 130, 133 [283 P. 960]; *Cockerill* v. *Tobin* (1922) 59 Cal.App. 112, 114 [209 P. 1022]; *Brichetto* v. *Raney* (1926) 76 Cal.App. 232, 247 [245 P. 235]; *Commercial Bank* v. *Redfield* (1898) 122 Cal. 405, 408 [55 P. 160, 772]; *Mains* v. *City Title Ins. Co.* (1949) 34 Cal.2d 580, 584-585 [212 P.2d 873].)    Generally the phrase is synonymous with ''subordinate to.'' (*Cockerill* v. *Tobin*, *supra*;

[3]*Whiteman* v. *Leonard Realty Co.* (1961) 189 Cal.App.2d 373, 378 [11 Cal.Rptr. 211]; *Kelly* v. *Steinberg* (1957) 148 Cal.App.2d 211, 217 [306 P.2d 955]; *Montgomery* v. *Bank of America* (1948) 85 Cal.App.2d 559, 564 [193 P.2d 475]; *Gallagher* v. *California Pac. Title & Trust Co.*, (1936) 13 Cal.App.2d 482, 489 [57 P.2d 195]; and *Trask* v. *Garza* (1921) 51 Cal.App. 739, 743 [197 P. 807].

*Shay* v. *Roth* (1923) 64 Cal.App. 314, 318 [221 P. 967] and *Coffey* v. *Superior Court* (1905) 147 Cal. 525, 535 [82 P. 75].) ■ "The meaning usually attributed to such words as 'subject to' is that a promise that is so limited is a conditional promise, one that is different from that for which the offeror bargained. (Corbin on Contracts, Vol. 1, p. 186, § 61; *Humes* v. *Walker*, 116 Cal.App. 599, 601 [3 P.2d 33].)

"A contract is to be interpreted 'so as to give effect to every part, if reasonably practicable, each clause helping to interprete the other.' (Civ. Code, § 1641; Code Civ. Proc., § 1858.) ■ 'A contract shall be so construed as to give force and effect not only to every clause, but to every word in it, so that no clause or word may become redundant.' (*Cole* v. *Low*, 81 Cal.App. 633, 637 [254 P. 676].) Where a contract is partly written and partly printed, the written parts control the printed parts. (Civ. Code, § 1651; Code Civ. Proc., § 1862. See *Body-Steffner Co.* v. *Flotill Products*, 63 Cal. App.2d 555, 561 [147 P.2d 84].) ■ The intention disclosed by the written part prevails over the printed part. (*Burns* v. *Peters*, 5 Cal.2d 619, 623 [55 P.2d 1182].)'' (*Lawrence Block Co.* v. *Palston* (1954) 123 Cal.App.2d 300, 310 [266 P.2d 856].)

In the instant case there is no handwritten portion, but the instructions dated December 9, 1960, and June 16, 1961, reflect that the "subject to" and following language apparently was typed in a form used by appellant which contained the preceding language relating to the first lien.

This case is controlled by *Whitaker* v. *Title Ins. & Trust Co.* (1921) 186 Cal. 432 [199 P. 528], wherein the opinion recites: "Conceding, without deciding, that the plaintiff is entitled to the full benefit of the certificate issued to his assignor, his rights in the premises are limited to the express terms of the document. Instead of guaranteeing or insuring against the adverse claims to this real property which eventually defeated plaintiff's security, the certificate of the Title Company is expressly made subject thereto.

"The certificate on its face purports to have been issued to Caruthers Building Company, a corporation, and C. B. Williams. After reciting the examination of the various official records pertaining to this title, the document provides that 'The Title Insurance & Trust Company hereby guarantees that said title as appears from said records is vested in Caruthers Building Company, a corporation, subject to matters

set forth in note following description.' The note referred to is as follows: [omitted]

"Granting plaintiff the fullest recourse against defendant company, the foregoing is all he has to rely upon.

"The effect of this reference to the litigation of an adverse claim to real property was to inform the beneficiaries of the certificate that their title otherwise guaranteed was subject to the validity of the judgment in their favor in said action which the Title Company was unwilling to insure, but which it states, in the opinion of its attorneys, was good." (186 Cal. pp. 433-435.)

Appellant seeks to avoid the obvious construction that it ordered the title company to close the transaction upon issuing the title insurance actually issued which does not cover the assessment liens, because none of the original reports failed to show whether or not there were in fact in existence at the time the report was issued any assessments or obligations constituting a lien or, if so, the amounts thereof. Along the same line it asserts that since the reports fail to set forth the amounts of any lien, they in effect are representations that no present lien exists, but only the possibility of a future lien. This argument presupposes that the assessment district was created in a vacuum, whereas in fact its creation would only be authorized in order to perform some work and allocate the cost over the property involved. (See 40 Cal.Jur.2d, Public Improvements and Special Assessments, § 36 et seq.) In any event, if appellant had any question about the extent of the possible liens it had only to delete the "2nd" from its instructions to the title company.

Of the cases referred to above, *Spaziani* (215 Cal.App.2d 667, 681-685), indicates that it was improper to grant a nonsuit to the escrow holder where the instructions read, "First Deed of Trust to file: Construction loan to come," and the escrow holder failed to secure instructions from the seller, who admittedly was taking a second lien for the unpaid balance of the purchase price, regarding the parties, amount, or terms of payment which were authorized for the first loan. The escrow was closed when certain first loan papers were deposited at the instance of the purchaser. At first glance the situation appears similar to that presented here where the escrows were closed without advising appellant of the

amount of the assessment liens. The distinction is that in *Spaziani* the instructions as written were indefinite and uncertain, whereas in the instant case appellant, perhaps inadvisedly and inadvertently, but nevertheless definitely and unconditionally, instructed the title company what to do. Furthermore, in *Spaziani* the case was remanded for a determination of the facts by the trial court, whereas in the instant case the trial court has found that the title company "obeyed the written instructions of plaintiff" and "that plaintiff suffered no loss or damage as a result of any act of defendant."

In *Amen* (58 Cal.2d 528, 531), the escrow holder failed to notify the purchaser of a tavern of the necessity of securing a state sales tax clearance certificate, although it had received a notice to that effect addressed to the purchaser in its care from the State Board of Equalization. The escrow provided that purchaser would assume $10,000 of seller's obligations and any excess debts should be paid out of the proceeds of the sale. The escrow holder was held liable for the amount of a tax lien asserted against the purchaser, the $10,000 having been otherwise disbursed. In the instant case the title company had advised appellant of the situation which gave rise to the liability.

In *Whiteman* (189 Cal.App.2d 373) the escrow holder was authorized to pay off an existing obligation in a sum which was left blank. It had been orally advised that the seller in order to clear title would only pay the amount due and no prepayment fee. It was held liable for a prepayment fee paid and deducted from the proceeds of sale. There was no such disregard of instructions in this case.

In the *Rianda* case (35 Cal.2d 170, 173) the rule is recognized, but the court found no breach of duty in failing to present and cash a check which had been placed in escrow where there were no express instructions so to do, and the state of the transaction was not such as to indicate that the escrow holder should have been required to close the transaction.

An examination of cases involving the interpretation of title insurance policies generally, and more particularly the rule which requires that all ambiguities be resolved against the insurer, produces no contrary conclusion. (See *Hansen* v. *Western Title Ins. Co.* (1963) 220 Cal.App.2d 531, 535 [33 Cal.Rptr. 668, 98 A.L.R.2d 520]; *J. H. Trisdale, Inc.* v. *Shas-*

ta etc. *Title Co.* (1956) 146 Cal.App.2d 831, 835 [304 P.2d 832]; *National Holding Co.* v. *Title Ins. & Trust Co.* (1941) 45 Cal.App.2d 215, 221 [113 P.2d 906]; and *Coast Mutual Building-Loan Association* v. *Security Title Ins. & Guar. Co.* (1936) 14 Cal.App.2d 225, 229 [57 P.2d 1392].) Although this action is not on the policy, if the principle be applied to the title reports, there is no ambiguity on their face, and, if there were, appellant has not explained why it adopted it in the escrow instructions.

Finally, resort may be had to authorities dealing with the liability of abstractors of title. In fact appellant has asserted that respondents "were employed to search the records and having undertaken the job it was their duty to employ reasonable skill and ordinary diligence. . . ." The record reflects, however, that the first, second and fourth title reports were apparently prepared at the instance of others than appellant. Appellant cannot, therefore, claim a contractual right to the performance of the work incorporated in those three reports, and whether or not as a third party it is in a position to assert general negligence is questionable. (See *Hawkins* v. *Oakland Title Ins. & Guaranty Co.* (1958) 165 Cal.App.2d 116, 127-131 [331 P.2d 742].) The rule upon which appellant relies is recognized in *Hawkins, supra,* where the court concludes that the insured under a policy of title insurance, who sued in tort for misrepresentation should be permitted to amend his defective cause of action to allege, if so advised, "that defendant undertook to search the title for their benefit, and negligently performed this undertaking or negligently reported the results of the investigation incorrectly." (165 Cal.App.2d at p. 127; and see *J. H. Trisdale, Inc.* v. *Shasta etc. Title Co., supra,* 146 Cal.App.2d 831, 837-838; and *Overholtzer* v. *Northern Counties Ins. Co.* (1953) 116 Cal.App.2d 113, 128-129 [253 P.2d 116].) In each of the foregoing cases there was clearly error on the part of the abstractor. In the instant case the sole claim is insufficient information, and appellant has failed to show that it considered it as insufficient at the time.

In *Union Realty Co.* v. *Ahern* (Mun. Ct. App. D.C. 1952) 93 A.2d 84, the title company appealed from an adverse judgment holding it liable to the insured for front foot charges levied for public improvements. In reversing the judgment the court found the charges were not liens at the time the policy was issued and were thereby excluded. It

further appears: "The purchasers argue that even if there was no breach of the guaranty of title, the title company is still liable for breach of implied warranty or negligence in failing to ascertain, or, if it did ascertain, then in failing to inform the purchasers of the future front foot charges which would be levied on their property. We find no basis for this contention. The title company in its certificate of title and on its settlement sheet disclaimed responsibility for the correctness of information relating to taxes and assessments and we see no invalidity of such disclaimer. The settlement sheet examined and approved by the purchasers contained an adjustment to time of transfer of 'Front Foot Benefit Chg.' If the purchasers did not understand this item they could have made inquiry. In the absence of such inquiry, the title company could assume they were fully informed as to the nature of the front foot charges. We do not think that it was the duty of the title company to undertake to advise the purchasers as to their legal rights under their contract with respect to the front foot charges." (93 A.2d at p. 86.)

The record reflects that perhaps appellant's employees misconceived the nature of the bond which was given to insure the payment of claims of the contractors, etc., finishing the improvements as referred to in the instruction, and the imposition of liens on the property for the funds necessary to pay those claims. Having been satisfied that the former was given, no further inquiry was made as to the latter. Appellant apparently did satisfy itself that the improvements had been in fact constructed.

It was noted by the learned trial judge that in the November and December instructions appellant only required the payment of the first installment of taxes, and that despite a subsequent insistence on a "first lien," it was content then to permit the second installments to remain a lien on the respective parcels involved. So it may be said that inasmuch as any assessments were reported as being collectible with county taxes, the appellant was at that time similarly unconcerned about them.

In short, the record sustains the conclusions of the lower court that respondents carried out the escrow and issued title insurance in accordance with the express instructions of appellant, and that any loss sustained by appellant because it failed to take into account the assessment liens against the parcels involved was due to its failure to request their elimination as an exception by payments out of the

proceeds of the funds it advanced, or to request further details so it could withhold appropriate amounts from the sums otherwise advanced.

The judgment is affirmed.

Sullivan, P. J., and Molinari, J., concurred.